IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

POOYA MAJDZADEH-KOOHBANANI,

    **Plaintiff,**

v.                                                    3:09-CV-1951-G-BK

JASTER-QUINTANILLA DALLAS, LLP,

    **Defendant.**

### FINDINGS, CONCLUSIONS AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the provisions of 28 U.S.C. § 636(b) and the District Court's order of November 8, 2010, this case has been referred to the United States Magistrate Judge for a recommendation on Defendant Jaster-Quintanilla Dallas, LLP's ("JQ") motion for summary judgment. (Doc. 20). For the following reasons, the undersigned recommends that the Court **GRANT** Defendant's *Motion for Summary Judgment*. The findings, conclusions and recommendation of the Magistrate Judge are as follows:

### I. BACKGROUND

In October 2009, Plaintiff filed a *pro se* complaint alleging that his former employer, JQ, had terminated him based on his race and national origin (Iranian). (Doc. 1 at 8). Plaintiff claimed that he worked at JQ, an engineering firm, as an engineer from June 2006 until his termination in November 2008. (*Id.* at 3, 7). Plaintiff alleged that in an effort to obtain lawful permanent resident status, he completed a "prevailing wage form," a requirement of the Texas Workforce Commission ("TWC"). (*Id.*). JQ sent the form to the TWC in July 2007, and the

TWC subsequently notified JQ that the prevailing wage for Plaintiff's position was $59,774 per year. (*Id.* at 4). However, Plaintiff claimed that JQ was only paying him $56,000. (*Id.*). Plaintiff contended that when he inquired about the discrepancy, one of his supervisors, Tom Scott, told him that JQ could not pay the increased salary because it would then be forced to raise other engineers' salary too. (*Id.* at 4-5).

Plaintiff further alleged that (1) JQ racially segregated its Caucasian and non-Caucasian engineers in seating assignments, (2) JQ generally did not assign Caucasian draftsmen to work for non-Caucasian engineers, (3) he was not taken out for lunch on his first day of work despite JQ's practice of doing so, and (4) in September 2008, JQ supervisor John Bremer verbally abused him. (*Id.* at 6). Plaintiff contended that after he continued to demand that he be paid the prevailing wage rate, the atmosphere at JQ changed and he ultimately was terminated by Tom Scott and Jason Hart in November 2008 under the stated pretextual reason that the termination was based on Plaintiff's poor work quality and performance. (*Id.* at 7). Based on these facts, Plaintiff raised a federal cause of action under Title VII of the Civil Rights Act of 1964, as well as state law claims of (1) fraud/misrepresentation based on JQ's alleged statement on a form sent to the TWC that JQ would pay him the minimum prevailing wage, (2) defamation insofar as JQ published false statements to the U.S. Department of Labor to the effect that Plaintiff had a poor work ethic and performance, and (3) intentional infliction of emotional distress ("IIED") based on JQ's discriminatory acts against him. (*Id.* at 8-12).

Defendant now has filed its *Motion for Summary Judgment*. (Doc. 20). In support, Defendant has submitted documentation which reveals the following facts: Following Plaintiff's job interviews with a number of supervisors at JQ, Steve Lucy, the JQ principal in charge of the

Dallas office, offered Plaintiff a job via an emailed letter in June 2006 at a base salary of $53,000 per year plus a $3,000 signing bonus. (Koohbanani Dep. at 55-56 & Ex. 5; Lucy Dep. at 44; Lucy Decl. at ¶ 4). According to Lucy, Plaintiff's starting salary was higher than the starting salary of at least six other project engineers (out of eleven total), including four Caucasian engineers. (Lucy Decl. at ¶ 5). Plaintiff testified that in 2007, JQ agreed to sponsor him for a work visa and increased his salary to $56,000 per year in May 2007. (Koohbanani Dep. at 68-69, 73).

Lucy averred that the TWC's prevailing wage determination was made for purposes of Plaintiff submitting his application for permanent labor certification, but JQ was not required to pay him that salary until he became a lawful permanent resident. (Lucy Decl. at ¶ 9). Plaintiff also testified that the prevailing wage determination was part of his permanent employment certification process and stated further that (1) the wage amount was determined by someone at the TWC, and (2) the date on which TWC made its wage determination was August 1, 2007. (Koohbanani Dep. at 79-80). He also testified that he was not aware of any other person in his job position that earned the prevailing wage of $59,774. (Koohbanani Dep. at 142-43).

Plaintiff acknowledged that in December 2007, his new supervisor, John Hoenig, drafted a memo to Plaintiff's employee file, noting that there were a lot of problems with his work, including unclear connections and a vast lack of dimensioning, which Hoenig did not expect from someone with Plaintiff's experience. (Koohbanani Dep. at 116-25; Ex. 17). According to Lucy, Hoenig also gave Plaintiff a poor performance review in 2008, but Plaintiff still received a $2,000 raise to $58,000 shortly thereafter. Lucy testified that while JQ's pay increases were primarily merit-based, JQ also had to take into account the market forces and wages that needed to be paid to retain employees. (Lucy Dep. at 93). Lucy averred that JQ gave some salary

3

increases because of pressure within the market for obtaining staff, but could not recall the specific reason for Plaintiff's 2008 raise. (Lucy Dep. at 93-94).

Scott testified that he counseled Plaintiff on one project and told Plaintiff that he had been extremely slow which resulted in the project having to be rushed. (Scott Dep. at 32-33, 35; Ex. 1). Scott's conference record also indicated that he had discussed with Plaintiff: (1) the gaps in Plaintiff's structural design, (2) the fact that several structural and design elements were not addressed, and (3) Plaintiff's failure to follow Scott's specific instructions. (Scott Dep. at 32-33, 35; Ex. 1). JQ then moved Plaintiff to his final supervisor, Jason Hart. (Koohbanani Dep. at 92).

Scott, Hart, and Lucy testified that in August or September 2008, Lucy asked his team leaders to identify underperforming employees for termination, and Hart ranked Plaintiff at the bottom of his team's list due to Plaintiff's problems with productivity and work quality. (Lucy Dep. at 95-96, 102-04; Lucy Decl. at ¶ 11; Scott Dep. at 54; Hart Dep. at 42-43). In October 2008, Plaintiff complained to Hart that fellow engineer John Bremer had used profanity and other offensive language in criticizing Plaintiff's work, including stating that if Iranians knew how to engineer, thousands of people would not have died in an earthquake in Iran in 2004. Bremer was counseled regarding the incident and not considered for promotion that year due to his behavior. (Koohbanani Dep. at 92-99, 104; Hart Dep. at 31-32, 35-37; Ex. 3; Lucy Dep. at 90).

In November 2008, Lucy implemented his prior decision to terminate Plaintiff due to his performance problems, and Hart explained in the letter of termination that Plaintiff's work was inconsistent, incomplete and had not improved. (Lucy Decl. at ¶ 12; Lucy Dep. at 102-04; Koohbanani Dep. at 124-25; Hart Dep. at 48-50; Ex. 7). Lucy testified that he was generally responsible for termination decisions. (Lucy Dep. at 102). He also averred that when Plaintiff

4

was terminated, his salary was higher than six of the eleven other project engineers, including three Caucasian engineers. (Lucy Decl. at ¶ 5). JQ hired a Vietnamese male, Hoang Tringh, to replace Plaintiff, and JQ withdrew its sponsorship of Plaintiff's permanent work visa. (Lucy Dep. at 104; Lucy Decl. at ¶12).

Plaintiff testified that he thereafter received unemployment benefits and, in response to TWC's inquiry, JQ reported that it had terminated Plaintiff due to poor performance, not misconduct. (Koohbanani Dep. at 51-52, 181). Plaintiff speculated that he and other minority employees probably had been fired because JQ was downsizing. (Koohbanani Dep. at 145). He admitted that, outside of complaining to Hart about Bremer's conduct, he never complained to anyone at JQ about discrimination. (Koohbanani Dep. at 166). Additionally, Plaintiff claimed that JQ defamed him when it informed the TWC, in response to TWC's question about why he was terminated, that he was fired because his performance was poor rather than because of any misconduct. (Koohbanani Dep. at 181-83).

JQ argues that it is entitled to summary judgment on Plaintiff's discrimination claims because the majority of his complaints about his work environment, such as not being treated to lunch and his seating arrangements, are not "adverse employment actions" within the meaning of Title VII's framework. (Doc. 20 at 12-13). As for Plaintiff's claim that he was not paid the prevailing wage based on his race and national origin, JQ contends that Plaintiff cannot show that JQ treated similarly situated Caucasian employees more favorably than him. (*Id.* at 14). Next, JQ argues that it had a legitimate, non-discriminatory reason for not paying Plaintiff the prevailing wage rate insofar as it was not legally required to do so until Plaintiff became a lawful permanent resident. (*Id.* at 15-16).

5

As for Plaintiff's unlawful termination claim, JQ points out that Lucy hired and fired Plaintiff, giving rise to a "same actor" inference that discrimination was not the motive behind Plaintiff's firing. (*Id.* at 16-17). Further, JQ maintains, Plaintiff's *prima facie* case fails because Plaintiff was replaced by a non-Caucasian. (*Id.* at 17-18). Next, JQ argues that it had a legitimate reason for terminating Plaintiff's employment in light of his poor performance, and Plaintiff cannot demonstrate, outside of speculating, that its reasons for firing him were a mere pretext for discrimination. (*Id.* at 18-20). Additionally, JQ maintains that Bremer's statements to Plaintiff are insufficient to show discriminatory animus because they were isolated remarks made by a non-decisionmaker. (*Id.* at 20-21).

Finally, JQ urges that Plaintiff's state law claims fail because (1) JQ did not make a fraudulent statement to Plaintiff that induced him to take the JQ job; (2) an action for defamation cannot lie because Plaintiff did not allege that he had to tell any potential employers about the "unsupported reasons" for his termination, and JQ's statements to the TWC about Plaintiff's poor performance were protected by a qualified privilege; and (3) IIED is not an available cause of action because it is based on the same facts as Plaintiff's discrimination claims and, in any event, the acts in question are not sufficiently outrageous to qualify as IIED. (*Id.* at 21-29).

In response, Plaintiff has submitted supporting documentation, which reveals the following: Lucy testified that Plaintiff's first annual evaluation in 2006 was generally good. (Lucy Dep. at 82). Plaintiff testified that Scott praised him verbally for his work on one project (but Scott also testified that Plaintiff's work on the project was not complete, and his August 2007 conference record supported this). (Koohbanani Dep. at 113; Scott Dep. at 31-32; Doc. 24 at 87, Scott Conference Rec. dated 8/22/07). Plaintiff testified that the August 2007 conference

record drafted by Scott was falsified because it purported to document a discussion about his performance problems that never occurred. Plaintiff averred that the purpose of that meeting had been to discuss the prevailing wage issue, and during the meeting Scott told him his work was very satisfactory and did not tell Plaintiff that he had failed to follow instructions. (Koohbanani Dep. at 112-15; Doc. 24 at 87). Plaintiff testified that he asked Scott during this conference why he was not being paid the prevailing wage, and Scott told him that he was not aware of such a wage and would look into it, but that paying Plaintiff more would affect JQ's finances. (Koohbanani Dep. at 88).

Plaintiff also testified that in late 2007, JQ transferred him to work for John Hoenig. He was never given time to meet with Hoenig to discuss Hoenig's expectations and style, so he purposely left sections of his first project blank in an effort to set up a meeting. Plaintiff testified that Hoenig misinterpreted this as being a performance problem, but they verbally resolved the issue. (Koohbanani Dep. at 89-91, 196-97).

Plaintiff averred that he was then transferred in early 2008 to work for Hart. (Koohbanani Dep. at 92-93). When asked whether Plaintiff was a good engineer, Hart testified that Plaintiff was competent and stated that Plaintiff was his lowest ranking employee based on of his productivity and work quality. (Hart Dep. at 28, 43). Plaintiff acknowledged that Hart gave him an annual evaluation which indicated some areas in which he needed improvement, and told him he needed to work more quickly on identifying solutions, which is the same criticism Hoenig gave him. (Koohbanani Dep. at 122). Hart testified that in August or September 2008, he was asked to rank his team members, and he ranked Plaintiff at the bottom. In October 2008, he, Lucy, and Scott all agreed to terminate Plaintiff. (Hart Dep. at 42-45).

7

In his opposing memorandum of law, Plaintiff cites to his deposition testimony to support his argument that he was subjected to a pervasive pattern of discrimination at JQ when (1) he was seated separately from non-Caucasian engineers, who were often given better seats, (2) JQ failed to assign Caucasian draftsmen to minority engineers, (3) he and other minorities were not taken out to lunch on their first day of work, unlike many Caucasians, (4) when Caucasian employees were out sick, they were especially welcomed back to the office by JQ employees, while he was not welcomed back, (5) he was made to feel uncomfortable for practicing Islam during his break time, and (6) four minorities and only one Caucasian were ranked at the bottom of their teams in anticipation of termination. (Doc. 23 at 15).

Plaintiff argues that he has stated a *prima facie* case of discrimination as relates to his unfair pay claim because Scott informed him that he could not increase his salary to match the prevailing wage rate as that would result in a negative financial impact on JQ, which shows that he was discriminated against based on his work visa status. (*Id.* at 21). Plaintiff also asserts that JQ cannot establish a legitimate non-discriminatory reason for failing to pay him the higher wage when he was entitled to it. (*Id.* at 22).

As for Plaintiff's termination claim, he argues that the "same actor" inference does not apply because Lucy was not the only person who hired him, and he was recommended for termination by Hart. (*Id.* at 22-23). He also alleges that Bremer's discriminatory statements are sufficient to show JQ's animus, and JQ cannot demonstrate a legitimate reason for firing him in light of the positive performance reviews and raises awarded Plaintiff. (*Id.* at 23-24). He claims that Lucy's self-serving affidavit stating that the raises were "salary adjustments" based on market conditions, rather than merit increases, is trumped-up evidence to obtain dismissal of his

8

case. (*Id.* at 24). Finally, Plaintiff claims that he can show pretext because of the inconsistency between JQ's asserted reasons for terminating him and its positive performance reviews and salary increases in his favor. (*Id.* at 25-27).

Addressing his fraud/misrepresentation claim, Plaintiff contends that JQ falsely represented to him that he was not entitled to the prevailing wage in an effort to keep him employed for less money. (*Id.* at 27-28). He also argues in support of his defamation claim that he was obligated to tell potential employers that he was terminated and thereby cause a negative impression. (*Id.* at 28-29). Finally, Plaintiff contends that he is entitled to proceed on his IIED claim because of Bremer's verbal abuse. (*Id.* at 29-30).

In reply, JQ reiterates its prior arguments and also argues that the purpose of requesting a prevailing wage determination during the work visa process is to document the employer's ability to pay the salary when it submits an application for permanent labor certification, which had not happened when Plaintiff was fired. (Doc. 25 at 4-6) (citing 20 C.F.R. §§ 656.10(c)(1)-(4), 656.40). JQ also contends that, while a team of employees interviewed Plaintiff, Lucy made the final hiring decision and sent the offer of employment to Plaintiff and also made the final termination decision, and Plaintiff's statements to the contrary are speculative. (*Id.* at 6-7). Further, JQ points out that Plaintiff is attempting to change his fraud argument because he first argued that JQ knowingly made false statements to the Department of Labor, but now is belatedly alleging that JQ made misrepresentations to him about not having to pay him the prevailing wage. (*Id.* at 11).

## APPLICABLE LAW AND ANALYSIS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party moving for summary judgment has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotes omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted). Unsubstantiated beliefs are not competent summary judgment evidence. *de la O v. Housing Authority of City of El Paso*, 417 F.3d 495, 502 (5th Cir. 2005). "Summary judgment, to be sure, may be appropriate, even in cases where elusive concepts such as motive or intent are at issue, . . . if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 989 F.2d 1257, 1266 (5th Cir. 1991) (citation omitted and alternations in original).

### A. Discrimination Claim

*1. Applicable Law*

Typically, to establish a *prima facie* case of discrimination, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was treated less favorably because of his membership in a protected class than were other similarly situated employees who were not members of the protected class. *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). However, the *prima facie* test is not a rigid formulation. A cause of action for discrimination may lie even where the employee who replaces the terminated plaintiff is of the same protected class as the plaintiff, so long as the plaintiff can show that he suffered an adverse action that an employee of an unprotected class would not have suffered. *Nieto v. L & H Packing Co.*, 108 F.3d 621, 624 n.7 (5th Cir. 1997); *EEOC v. Brown & Root, Inc.*, 688 F.2d 338, 340 (5th Cir. 1982).

"Adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002). Actions such as assigning an employee more difficult work, giving employees unequal break times, and giving allegedly biased annual evaluations are not "adverse actions" within the meaning of Title VII. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 486 (5th Cir. 2008) (break requests); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir. 1999) (unfair employee evaluations); *Benningfield v. City of Houston*, 157 F.3d 369, 376-77 (5th Cir. 1998) (heavier work load). Further, "[t]o establish a *prima facie* case of racial discrimination with respect to compensation, the plaintiff must show

11

that he was paid less than a member of a different race was paid for work requiring substantially the same responsibility." *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. Unit A 1981).

Once a plaintiff establishes a *prima facie* case of discrimination, the employer can rebut that showing by attempting to "articulate some legitimate, nondiscriminatory reason" for its employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The plaintiff then has the opportunity to show by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993). To show pretext, the plaintiff "must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates." *Jackson v. Watkins*, 619 F.3d 463, 467 (5th Cir. 2010) (quotation omitted).

*2. Non-Actionable Events*

As an initial matter, the vast majority of events that Plaintiff claims were discriminatory are not actionable because they are not "adverse employment actions" within the meaning of Title VII's framework. These claims include (1) Plaintiff not being treated to lunch, (2) his seating arrangements, and (3) his not being especially welcomed back to the office by JQ employees after he had surgery. *See Shackelford*, 190 F.3d at 407. Further, his feeling uncomfortable while praying during his break time is not pertinent because he did not claim religious discrimination. Thus, these claims should be dismissed on summary judgment.[1]

---

[1] While the Court concludes that neither claim is individually actionable under Title VII, it has considered these factual allegations collectively in the context of Plaintiff's remaining claims of discrimination and his assertion that he "was subjected to an insidious, systematic pattern of discriminatory actions... by JQ and its agents." (Doc. 23 at 14-15).

*3. Disparate Pay*

Plaintiff's remaining discrimination claims are for disparate pay and unlawful termination. Plaintiff's claim that he was not paid the prevailing wage based on his race and national origin fails because he has not shown that he was paid less than a non-minority was paid for the same work. *Pittman*, 644 F.2d at 1074. The undisputed evidence in this case is that, at the time of his termination, Plaintiff's salary was higher than six of the eleven other project engineers, including three Caucasian engineers. (Lucy Decl. at ¶ 5). Plaintiff himself testified that he was not aware of any other person doing his job that earned the prevailing wage of $59,774. (Koohbanani Dep. at 142-43). Thus, Plaintiff cannot establish a *prima facie* case of disparate pay. *Pittman*, 644 F.2d at 1074. Even if he could, JQ was not legally obligated to pay Plaintiff the prevailing wage rate until he became a permanent resident. 20 C.F.R. § 656.10(c)(1) (requiring that an employer certify on an alien's application for permanent employee certification that it "will pay" the prevailing wage from the time the alien is admitted to take up the certified employment).

*4. Discriminatory Termination*

JQ does not dispute that Plaintiff (1) is a member of a protected class; (2) was qualified for his position; and (3) suffered an adverse employment action. *Lee*, 574 F.3d at 259. While JQ attempts to defeat Plaintiff's *prima facie* case by invoking the "same actor" inference insofar as Lucy both hired and fired Plaintiff, there are material facts in dispute as to the hiring and firing scenarios, given that both decisions appear to have been made collaboratively. (Koohbanani Dep. at 55-56, 124-25 & Ex. 5; Lucy Dep. at 44, 95-96, 102-04; Lucy Decl. at ¶¶ 4, 11-12; Scott Dep. at 54; Hart Dep. at 42-43, 48-50). Further, JQ's argument that Plaintiff's *prima facie* case

13

fails because he was replaced by a non-Caucasian is meritless. *Nieto*, 108 F.3d at 624 n.7.

Nevertheless, JQ provided a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. Although Plaintiff's annual performance reviews were not included in the record, the testimony about the reviews indicates that both Hoenig and Hart pointed out that Plaintiff needed improvement in some areas, including in working towards solutions more quickly. (Koohbanani Dep. at 122). Further, other performance problems were documented in the record by JQ supervisors and, while Plaintiff may have disagreed with his supervisors about the severity of his problems, that is insufficient to create a material disputed fact. *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (noting that if the employer produces *any* evidence which could permit the conclusion that there was a nondiscriminatory reason for the plaintiff's termination, then the employer has satisfied its burden of production); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (holding that even an employer's "incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason"); (Koohbanani Dep. at 113, 116-25, 196-97 & Ex. 17; Scott Dep. at 32-33, 35 & Ex.1). Moreover, while Hart may have characterized Plaintiff as "competent," that does not mean that Plaintiff still was not the lowest ranked person on his team. (Hart Dep. at 28, 42-43).

Plaintiff cannot demonstrate that JQ's legitimate non-discriminatory reasons for terminating him were a pretext for discrimination. *St. Mary's Honor Center*, 509 U.S. at 511. JQ correctly argues that Bremer's treatment of Plaintiff is insufficient to show discriminatory animus because Bremer's comments were stray remarks, and there is no evidence in the record to suggest that Bremer was in a position to influence the decision to terminate Plaintiff. *Palasota v.*

14

*Haggar Clothing Co.*, 342 F.3d 569, 578 (5th Cir. 2003) (holding that discriminatory remarks can be considered even if they were not uttered by the formal decisionmaker, if the speaker could influence the termination decision). Further, in light of Plaintiff's failure to rebut JQ's evidence of his documented performance problems, he cannot demonstrate, outside of speculation, that JQ's reasons for firing him were a pretext for discrimination. *Jackson*, 619 F.3d at 467; *Int'l Shortstop, Inc.*, 989 F.2d at 1266. Thus, summary judgment is warranted on his termination claim

**B. Fraud/Misrepresentation**

In his complaint, Plaintiff alleged that JQ engaged in fraud/misrepresentation by stating in a form sent to the TWC that it would pay him the minimum prevailing wage of $59,774, and he relied to his detriment on this misrepresentation because he was induced to take the job with JQ based on the false statement. (Doc. 1 at 11-12). In his response to JQ's summary judgment motion, however, Plaintiff now contends that JQ falsely represented to him that he was not entitled to the prevailing wage rate in an effort to keep him employed for less money. (Doc. 23 at 27-28). Whatever the theory of his fraud claim may be, it fails.

The elements of fraud in Texas are that: (1) the defendant made a representation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation the defendant knew it was false or made the representation recklessly and without knowledge of its truth; (5) the defendant made the representation with the intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and (7) the representation caused the plaintiff injury. *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

15

Plaintiff's first theory, that the misrepresentation was made to the TWC, fails because Texas law requires that the defendant make the representation to the plaintiff, not a third party. *Id.* Plaintiff's second theory, that JQ falsely told him that he was not entitled to the prevailing wage, fails because this was not a misrepresentation. JQ was not obligated to pay Plaintiff the prevailing wage until he received his permanent employment certification. 20 C.F.R. § 656.10(c)(1). Thus, JQ is entitled to summary judgment on Plaintiff's fraud/misrepresentation claim.

**C.     Defamation**

Plaintiff again has changed his theory of the case in regard to his defamation claim. In his complaint, he alleged that JQ had published false statements about him to the U.S. Department of Labor to the effect that Plaintiff had a poor work ethic and performance. (Doc. 1 at 11-12). In his summary judgment response, he argues that he was obligated to "self-publish" the defamation by telling potential employers that he was terminated, which would cause a negative impression. (Doc. 23 at 28-29). Again, both theories fail.

Under Texas law, a defamation claim brought by a private individual requires proof that the defendant (1) published a statement; (2) that was defamatory to the plaintiff; (3) while acting with negligence as to the truth of the statement. *See WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex. 1998). A statement is defamatory if it tends to injure the plaintiff's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or if it tends to impeach that person's honesty, integrity, or virtue. *See Cain v. Hearst Corp.,* 878 S.W.2d 577, 580 (Tex. 1994); *Hanssen v. Our Redeemer Lutheran Church,* 938 S.W.2d 85, 92 (Tex. App.-Dallas 1996, writ denied).

Under Plaintiff's first defamation theory, JQ's statements to the TWC regarding the reason for his termination are protected by a qualified privilege. To be entitled to a common-law qualified privilege, the defendant's statement must (1) be made without actual malice (i.e. in good faith), (2) concern a subject matter in reference to a duty the author owes, and (3) be communicated to another party having a corresponding interest or duty. *San Antonio Credit Union v. O'Connor*, 115 S.W.3d 82, 99 (Tex. Civ. App. - San Antonio 2003, pet. denied). In this case, JQ's statement of the reasons for Plaintiff's termination was made in good faith as it is supported by the evidence discussed above in relation to Plaintiff's job performance. Second, JQ had a duty to communicate this information to the TWC in response to the TWC's inquiry as to why Plaintiff was terminated. Plaintiff himself testified that JQ's statement to the TWC was in response to TWC's inquiry. (Koohbanani Dep. at 51-52, 181). Moreover, the TWC had an interest in learning the reasons for Plaintiff's termination so it could determine whether to pay unemployment benefits to him. *See Patrick v. McGowan*, 104 S.W.3d 219, 224 (Tex. App. – Texarkana 2003, no pet.) (finding that allegedly defamatory statements made by an employer to the TWC were not defamatory because they were protected by the qualified privilege).

Plaintiff's second theory, that he was required to self-publish the defamatory statements, also lacks merit. Plaintiff has not alleged that he was required to tell any potential employers that he was terminated specifically for poor work performance. Rather, he maintains only that he was obligated to inform them that he was terminated, which is unquestionably true. (Doc. 23 at 28-29). Because truth is an absolute defense to a defamation action in Texas, Plaintiff's claim fails. *Wehling v. Columbia Broadcasting System*, 721 F.2d 506, 509 (5th Cir. 1983). Thus, the Court should grant summary judgment in JQ's favor on Plaintiff's defamation claim.

17

**D.     IIED**

Plaintiff alleged in his complaint that he suffered from IIED based on JQ's segregation of him from Caucasian employees as well as Bremer's use of profanity against him. (Doc. 1 at 12). In his summary judgment response, Plaintiff limits his IIED claim to Bremer's verbal abuse, so that is the only claim that will be discussed here. (Doc. 23 at 29-30); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 (5th Cir. 1992) (holding that arguments not raised in a summary judgment response are waived).

In Texas, a plaintiff who sues his employer under anti-discrimination statutes cannot recover damages for IIED if the IIED claim is based on the same acts as those supporting the discrimination claim. *Hoffman-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). This is because IIED is a "gap-filler" tort and can only be brought where the victim has no other recognized theory of redress. *Id.* Thus, in *Zeltwanger*, where the gravamen of the plaintiff's complaint was sexual harassment and retaliation, the monetary remedies available for IIED were barred. *Id*. at 447-48. Because the basis for Plaintiff's IIED claim is for the verbal abuse he suffered from Bremer, which was also a basis for his Title VII claim, JQ is entitled to summary judgment on the IIED claim. *Id.*; (Doc. 1 at 7). Moreover, it is of no moment that Plaintiff's statutory discrimination claims also fail. *Zeltwanger*, 144 S.W.3d at 448.

## CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court **GRANT** Defendant's *Motion for Summary Judgment* (Doc. 20).

**SO RECOMMENDED** on December 20, 2010.

RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE